JOHN C. SHIRTS, IDAHO STATE BAR NO. 9295
UNITED STATES ATTORNEY
HEATHER S. PATRICCO, DISTRICT OF COLUMBIA BAR NO. 465883
DAVID G. ROBINS, IDAHO STATE BAR NO. 8494
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>vs.<br><br>ALEXANDER SCOTT MERCURIO,<br><br>Defendant. | Case No. 2:24-cr-00093-DCN<br><br>**UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM** |

The Defendant comes before the Court having pleaded guilty to the charge of Attempt to Provide Material Support to a Designated Foreign Terrorist Organization, specifically the Islamic State of Iraq and al-Sham ("ISIS") pursuant to 18 U.S.C. § 2339B. Driven by hateful self-radicalization, the Defendant nearly perpetrated a homicidal and suicidal attack. Only law enforcement intervention prevented a mass-casualty event. This case involves a thwarted terrorist attack on places of worship, and for the reasons stated herein, the Government recommends that the Court sentence the Defendant to a term of imprisonment of 216 months (18 years), to be followed by lifetime supervised release.

## PROCEDURAL BACKGROUND

On April 8, 2024, the Defendant was charged by criminal complaint with one count of Attempt to Provide Material Support to a Designated Foreign Terrorist Organization pursuant to 18 U.S.C. § 2339B. Dkt. No. 2. A one-count Indictment followed on April 9, 2024. Dkt. No 5. On August 25, 2025, the Defendant filed a Notice of Intent to Plead Guilty. Dkt. No. 32. Thereafter, on October 22, 2025, the Defendant pleaded guilty to the Indictment without the benefit of a plea agreement. Dkt. No. 38.

On March 26, 2026, the initial Presentence Investigation Report (PSIR) was issued. Dkt. No. 42. No objections to the PSIR were filed. The final PSIR was issued on October 28, 2026. Dkt. No. 46. The final PSIR calculated the Offense Level as 37 with a Criminal History Category as VI for a United States Sentencing Guideline (USSG) range of 360 months to life after applying the terrorism enhancement, pursuant to USSG § 3A1.4.[1] *Id.* at ¶¶ 69, 102.

However, because the statutory maximum sentence is 20 years, the USSG range drops to a USSG guideline term of imprisonment of 240 months. *Id.* As to supervised release, the Court shall impose any term of years, up to life. *Id.* at ¶ 104.

---

[1] The terrorism enhancement, USSG § 3A1.4, applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." "Federal crime of terrorism" is defined by reference to 18 U.S.C. § 2332b(g)(5) to mean "an offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of" one of a list of enumerated statutes. *See* USSG § 3A1.4, App. Note 1; 18 U.S.C. § 2332b(g)(5); *United States v. Alhaggagi*, 978 F.3d 693, 706–07 (9th Cir. 2020). The list of enumerated statutes includes providing material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B, the offense to which defendant pled guilty. *See* 18 U.S.C. § 2332b(g)(5). Based on the information provided herein, the Defendant's words and actions support application of this enhancement.

## SUMMARY

In the Defendant's own words – "It's a consequence if I got caught . . . [t]he point was to kill until I was killed." These were the Defendant's statements to a local news reporter, while in custody, just days after his arrest on terrorism charges. In the news article, the reporter characterized the Defendant as "unapologetic about his plans." The Defendant wasn't remorseful then – nor is he now.

Nearly two years prior to being caught, the Defendant went online expressing his support for ISIS and terrorist organizations, generally. The Defendant actively sought out those he believed supported the fight against the Christian faith. As time passed, he spread ISIS propaganda online, soliciting ISIS's involvement in and approval of his propaganda efforts. He created a library of materials that was to be shared among ISIS followers and would support ISIS's terrorist mission. During this time, the Defendant expressed his desire to travel overseas and join ISIS, as well as send money for the cause. Ultimately, citing lack of funds to travel, the Defendant decided to do a "home op" – to attack parishioners attending service at local churches in the Coeur 'd Alene area. The Defendant researched churches, bought materials to conduct an attack, and pledged his allegiance to ISIS mere days before the planned attack date – the end of Ramadan, the holy month for the Muslim faith.

To ensure success, the Defendant planned to incapacitate his father, steal his car and his firearms. A search of the Defendant's bedroom after arrest revealed items consistent with the Defendant's planned attack stored in his closet. This was not a spur of the moment decision by the Defendant. For nearly two years before his arrest, he provided unwavering support to ISIS. Only law enforcement intervention prevented the Defendant's planned massacre.

## SENTENCING ANALYSIS UNDER 18 U.S.C. § 3553

### A. The Nature and Circumstances of the Offense

1. Defendant Actively Sought Out ISIS Facilitators and Supporters

The Defendant was actively engaging with ISIS facilitators from at least July 2022 – and likely before. The Federal Bureau of Investigation (FBI) became aware of the Defendant as he was contacting a known ISIS member located overseas through an online encrypted messaging platform. The ISIS member was part of a group whose mission was to gather support for ISIS by obtaining monetary donations. Unbeknownst to the Defendant, the ISIS member was killed, and the FBI adopted a new online profile with the same display name used by the deceased ISIS member. Not having that knowledge, the Defendant wrote:

> Asalamulaikum wa Rahmatullahi wa Barakatuhu. ["May the peace, mercy, and blessings of Allah be with you."] I hope you are okay my brother. When I woke up, it displayed your account as deleted, so I was worried. But it appears to have just been a glitch...May Allah protect and preserve you and our brothers and sisters, keep us steadfast, forgive us of our sins, suffice us in all affairs, keep us sincere, free the prisoners, grant victory to the soldiers, and accept our worship and deeds.

*Bates No. 593*. Based on the Defendant's obvious familiarity with the ISIS member, this was not his first contact. His message expresses genuine concern over the ISIS member's welfare and prays for an ISIS victory on the battlefield. As it turns out, the Defendant had cultivated a relationship with other ISIS supporters/facilitators through online chat groups. It was only through FBI confidential human sources (CHS) did the Government learn the extent of the Defendant's pro-ISIS radicalization and network of ISIS contacts.

The Defendant instigated contact with ISIS supporters and continued in his use of online encrypted social media applications to communicate throughout nearly two years prior to his arrest. In early October 2022, in an online chat group – the Defendant declares that his priority is "H" (Hijrah, meaning migration or departure in Arabic) to join the "S" – which is the Islamic State:




*Bates No. 4055*. While the Defendant actively sought out ways to support ISIS, he also exercised operational security to avoid detection by routinely changing his social media username and display name, as well as operating multiple online social media channels to hide his identity. The Defendant also employed tradecraft in his various communication methods whereby he would set his communications to be deleted after a period – often every 14 days or sooner. As the Defendant got closer to the date of his planned attack, he set messages to "self-destruct" within an hour. While the Government attempted to monitor the Defendant's communications and plans using CHSs, not all of the Defendant's ISIS contacts were known to the Government. To this day, many remain unidentified.

2. The Defendant's Commitment to ISIS Ideology

Adherence to terrorist ideology is a significant aggravating factor and the Defendant's words and actions demonstrate deep, sustained commitment to ISIS. While his ultimate plans for attack became more refined over time, his allegiance to ISIS was steadfast.

- December 18, 2022: Shortly after the arrest of an ISIS fundraiser, the Defendant expressed sadness, urged others to pray for him, and credited him with guiding the Defendant toward ISIS. *Dkt. No. 46, ¶ 12*.

- January 1, 2023: On the first day of the New Year, the Defendant shared with an online chat group of ISIS supporters, his prayer for martyrdom on behalf of ISIS. *Bates No. 4067*.


أبو عمر المنارة

Dua for Martyrdom: اَللّٰهُمَّ إِنِّي أَسأَلُكَ شَهَادَةً فِي سَبِيلِكَ

Allāhumma innī as'aluka shahādatan fī sabīlik.

O Allah, I beg you for martyrdom in Your path.

The Messenger of Allah ﷺ said: "Whoever asks for martyrdom with sincerity will be ranked by Allah among the martyrs even if he died on his bed." (Muslim 1909)

Zayd b. Aslam (raḥimahullāh) narrates that 'Umar b. Khattab (raḍiy Allāhu 'anhu) would say [the above] and add: "and death in the city of your beloved." (Muwatta 1003)

- January 31, 2023: The Defendant sent ISIS propaganda created by an ISIS fundraiser that was arrested in December 2022 and wrote: "This page is one of the things that helped me believe what I do today," referring to ISIS ideology. *Dkt. No. 46, ¶ 14.*

- March 2023: Law enforcement recovered from his school-issued laptop a photograph of the Defendant wearing a black balaclava and making the ISIS-associated raised-finger gesture, along with more than 50 files glorifying ISIS, celebrating military victories, praising jihad, and martyrdom. *Dkt. No. 46, ¶ 20.*

- August 3, 2023: The Defendant pledged his allegiance to the new leader of ISIS after the prior leader was killed. He wrote:


السلام عليكم ورحمة الله وبركاته

Sending this to you as a friend and as a witness.

I pledge my allegiance to the Caliph of all Muslims, the Commander of the Faithful, the Mujahid, the Shaykh, Abu Hafs al-Qurashi (may Allah protect preserve him). I pledge to selflessly hear and obey, in times of ease and hardship, in matters of delight and dislike, never to disobey those in authority, unless I have clear proof of disbelief, from which I will have from Allah. And Allah is witness to my pledge.

11:59 AM

He continued his message with a prayer for the prior leader:




*Dkt. No. 46, ¶ 18, Bates No. 2805, 2807.*

- February 16-17, 2024: The Defendant stated he found and followed ISIS ideology during the pandemic, specifically through his contact with the ISIS fundraiser he expressed sadness for in December 2022. The Defendant stated he felt purpose within ISIS. *Dkt. No. 46, ¶ 22.*

- March 25-26, 2024: The Defendant planned to send a “bay’ah” to ISIS before his terrorist attack. *Dkt. No. 46, ¶ 31.*

- April 2-3, 2024: The Defendant repeated his attack plan while discussing his bay’ah. The Defendant recorded his bay’ah video, in which he held the knife in front of the ISIS flag that he requested be used as a propaganda picture after his death. *Dkt. No. 46, ¶¶ 39-42*. The picture appears as follows:




*Bates No. 2243.*

- April 6, 2024: The Defendant sent a final bay’ah audio recording for distribution after his death. In the recording, the Defendant begins in Arabic, continuing in English wherein he pledged his formal allegiance to ISIS, committing himself to jihad, declaring his intent to kill non-Muslims, and seeking martyrdom. *Dkt. No. 46, ¶¶ 44-45.*

  *See* Exhibit A (translation of audio recording).

The Defendant was fully entrenched in ISIS ideology by the time the Government identified the Defendant in July 2022. His commitment to ISIS only became stronger as time

passed. The statements and communications of the Defendant above represent only a small fraction of the totality of his conduct in this regard. Shortly before his planned attack he reached out to an unidentified ISIS supporter and received an Arabic translation of his planned bay'ah speech. The Defendant was committed. His parents, who supported him emotionally and financially tried on multiple occasions to steer him away from his religious obsession. But even those closest to him couldn't shake his resolve to join a group that kills non-Muslims for a living.

3. The Defendant's Dedication to Spreading ISIS Propaganda

Not only did the Defendant stand firm in his support for ISIS, but he also actively produced ISIS propaganda to encourage others to join the fight. He sought it out, consumed it, created it, and distributed it. He progressed from devotee to proselytizer – in other words, a transition from just an internalized believer to an active recruiter. This fact aggravates his crime, as shown below:

- January 26, 2023: The Defendant created a repository for ISIS propaganda. The Defendant uploaded numerous online links to pro-ISIS media outlet magazines. *Dkt. No. 46, ¶ 13.*

- February 3, 2023: The Defendant posted multiple files to a private online chat group containing pro-ISIS content and media files. *Dkt. No. 46, ¶ 15.*

- March 24, 2023: The "Lighthouse Foundation for Media Production" was established by the Defendant. The goal of the foundation in the Defendant's own words: "[t]he primary purpose of our foundation – in adherence to the orders of the Islamic State – is to spread its 'aqidah [core foundation or system of belief] and methodology." *Dkt. No. 46, ¶ 16, Bates No. 2564.*

- May 20, 2023: The Defendant created another new online chat group to be used as a repository for the Lighthouse Foundation's work. In so doing, he stated that he intended to create educational content in different languages to spread ISIS's doctrine. He also again pledged his allegiance to the Caliph [supreme political and religious leader] of all Muslims – the leader of ISIS. *Dkt. No. 46, ¶ 17.*

- July 14-16, 2023: In an online communication, the Defendant states that he made three (3) new publications to support ISIS. He also states that he would like to get involved in other projects – one of which would be financing ISIS. *Bates No. 7980.*

- August 3, 2023: The Defendant updated the Lighthouse Foundation's published pledge to reflect the name of the new ISIS leader – Abu Hafs al-Qurashi. *Dkt. No. 46, ¶ 18.*

- September 4, 2023: The Defendant shared a link to a new online channel he created in support of ISIS. Defendant wrote that it "openly preach[es] hate toward disbelievers." He also praised the 9/11 hijackers. *Bates No. 2944-2967.*

- February 13, 2024: The Defendant stated that if he had resources, he would travel and become a soldier or media operative for ISIS in West Africa. *Dkt. No. 46, ¶ 25.*

- February 17, 2024: The Defendant sent ISIS propaganda links over digital communications. *Dkt. No. 46, ¶ 22.*

- March 11, 2024: On the first day of Ramadan, the Defendant posts a message to an online chat group praying for the Islamic State (the Caliphate), whether the end is victory or martyrdom:



Polnoy6_27

السلام عليكم ورحمة الله وبركاته

Ramadan Mubarak my brothers. Ten years ago today - the first of Ramadan, 1435 - we were blessed to see the revival of the Caliphate upon the prophetic methodology. It remains in spite of the disbelievers and their coalition, by Allah's permission.

I ask Allah to accept the efforts and deeds of ourselves and our brothers and sisters, to free the prisoners and grant victory to our beloved State. May Allah make us one of His gallant soldiers fighting for His sake and His sake alone, with our lives ending in victory or martyrdom.

And the blessed end is for the righteous...

*Bates No. 2047.*

- March 28 through April 1, 2024: The Defendant created a digital communication channel titled "Library" and uploaded 91 files of ISIS propaganda. *Dkt. No. 46, ¶ 40.*

- April 3, 2024: The Defendant recorded his bay'ah video, in which he held the knife in front of the ISIS flag that he requested the video be used as a propaganda picture after his death. *Dkt. No. 46, ¶ 42 (shown on pg. 7, supra).*

- April 6, 2024: The Defendant recorded and transmitted a final bay'ah audio. In it, he claimed allegiance to ISIS, committing jihad for ISIS, stated his intention to kill non-Muslims, and quest for martyrdom. He sent this with instruction to release it

> after his attack and death. The Defendant confirmed that he intended to attack the next day, on April 7, 2024. *Dkt. No. 46, ¶¶ 44-45.*

Once again, the highlights above are only a small fraction of the propaganda that Defendant solicited, produced or distributed to and from ISIS supporters, both known and unknown. Defendant's willingness to disseminate ISIS propaganda, coupled with his own violent plotting, shows that he was not only willing to commit acts of violence himself, but also wanted others to commit violent offenses. By using digital means to amplify ISIS's message, he contributed to the support and inspiration of other terrorists. This conduct compounded the harm he intended to inflict on innocent parishioners and again demonstrates his disregard for human life.

4. The Defendant's Commitment to Violence

The Defendant exhibited a long-nurtured commitment to violence. His plan to kill innocent parishioners during worship wasn't an impulsive decision – it was developed after years of consuming and producing violent ISIS content as well as encouraging others to commit violent acts through such online production. His penchant for violence is revealed in the following facts:

- The Defendant's High School Issued Laptop: A review of the Defendant's laptop revealed numerous files confirming his commitment to ISIS and its ideology. There were more than 50 files of chants and songs that glorify the Islamic State. Some files of note that the Defendant bookmarked (bookmark names saved by the Defendant):
  - "Other Bookmark" — Video showing how to create a "Do it Yourself" tactical vest.
  - "Suicide-Martyrdom Bookmark" and "Violence Bookmark" — PDF of Book on "Heros – Mass Murder and Suicide."
  - "Violence Bookmark" Audio chant of "Answer the Call" — a call to the Islamic State and Martyrdom.

  *Bates No. 274.*

- October 17, 2023: The Defendant wrote in an online message that his "ideal self" is "someone who is always ready to fight and give up everything for the sake of Allah at a moments notice…." He ends with:




*Bates No. 3119.*

- November 28, 2023: The Defendant's profile picture for one of his online accounts touts a picture of an automatic weapon with a grenade.




*Bates No. 3160 - 3166.*

- February 13, 2024: The Defendant said that if he had resources, he would travel and become an ISIS soldier in West Africa. The Defendant further stated, "If I don't have money for either, I'll just do a home op." *Dkt. No. 46, ¶ 25.*

- March 21, 2024: The Defendant stated he had cravings for violence and fighting during Ramadan and stated he needed "better weapons than knives" and discussed his vision for an arson attack using a flamethrower. *Dkt. No. 46, ¶ 28.*

- March 22, 2024: The Defendant stated he craved "mayhem and terror" and wanted to conduct an attack to satisfy his "bloodlust." *Dkt. No. 46, ¶ 29.*

- March 23-24, 2024: The Defendant stated that "I really want to do an operation, but I just don't have a lot to work with right now. I really don't want to miss out on the opportunity for jihad in Ramadan, the month of conquests." *Dkt. No. 46, ¶ 30.*

The Defendant craved violence. The instances above reveal that violence was not something he reluctantly undertook; but rather it was actively desired, not an act of desperation.

5. The Defendant Desired to Provide Monetary Support to ISIS

In addition to providing himself as personnel to the Islamic State, Defendant was ready and willing to provide whatever ISIS needed or wanted. Monetary support was one of the other ways the Defendant intended to contribute to ISIS. It was only due to the Defendant's fear of his father uncovering his plans and his subsequent arrest by law enforcement that thwarted his completion.

In July of 2023, the Defendant first suggests financing ISIS. In an online communication with a CHS, the Defendant states that he has "other projects in mind…a new one about financing; a way to get lots of money flowing to the Jama'ah…."[2] *Bates No. 2743*. Subsequently in mid-September 2023, the Defendant comes up with an idea to develop a video game to support ISIS but notes that his father sees everything. He explains that the game "has a donation link to a Monero wallet. Little do donators know that it is being used to fund the Jama'ah. I am currently in a situation where my father sees everything happening with my bank account. I cannot donate without him noticing." *Bates No. 3050-3052*. In January 2024, and again in February 2024, the Defendant reiterates his idea to develop a video game to make money for himself and the Islamic State, but he worries about his father finding out. *Bates Nos. 1961 and 3764, respectively.* After confirming his attack plan in early April 2024, the Defendant requested assistance from a CHS in transferring his entire savings and checking account balances to ISIS, through cryptocurrency. *Dkt. No. 46*, ¶ 39.

[2] In this context, Jama'ah means a group or gathering of Islamic State members.

The Defendant never wavered in his commitment to transfer his life savings to support terrorism. Fortunately, due to law enforcement intervention, the Defendant was unsuccessful in his efforts.

6. <u>The Defendant's Plan to Kill Churchgoers in Coeur d'Alene, Idaho</u>

From the Defendant's first known initiation of contact with ISIS in July 2022, to his ultimate plan to kill individuals during worship – the facts of this case show a continuum of words and actions that escalated toward murderous intent. While the Defendant's plan went through several iterations, he ultimately decided to steal his father's firearms after incapacitating his father with a steel pipe to set off his killing spree. A rough timeline of the final weeks before the attack is depicted below:

- March 21, 2024: The Defendant stated that he had cravings for violence and fighting during Ramadan, but he needed "better weapons than knives." He also declared sincere intent to carry out arson attacks against churches with a homemade flamethrower – but states, "[if] I can get a gun or stronger weapon, engage police units." The Defendant then shared the following map identifying the locations of Christian churches in Coeur d'Alene, Idaho:




Defendant wrote: "It's something I'm serious about . . . . [j]ust look at how many are here near me." *Dkt. No. 46, ¶ 28, Bates No. 8253-8264.*

- March 25-26, 2024: The Defendant stated that he planned on walking to the nearest church, sending a pledge of allegiance to ISIS (a bay'ah) before attacking, then entering a church to kill as many people as possible while setting fire to the church. *Dkt. No. 46, ¶ 31.*

- March 26, 2024: The Defendant reached out to an online confidential source whom he believed was an ISIS financier telling him of his plan to attack churches in Coeur d' Alene and requesting his bay'ah be sent to ISIS Central Media after the attack.




*Dkt. No. 46, ¶ 32, Bates No. 2124.*

- March 27, 2024: The Defendant stated that he was acquiring materials for his attack, but they would be difficult to hide from his father. The Defendant also stated he intended to do weapons research. *Dkt. No. 46, ¶ 33.*

- March 27, 2024: To develop a flamethrower, the Defendant admitted that he would need sixty to seventy pounds of fuel. He discussed a martyrdom video he planned to record and transmit, and that there were twenty-five churches in his area that were potential targets. He stated he would travel on foot but was considering incapacitating his father to steal his father's vehicle and firearms. *Dkt. No. 46, ¶ 34.*

- March 28, 2024: The Defendant communicated that he was still trying to figure out what weapons he should use in the attacks and acknowledged that the flamethrower was impractical. *Bates No. 4632-4634.*

- March 28, 2024: The Defendant discussed potential churches as targets and the planned order in which he would attack them. He discussed using butane or propane as improvised grenades. *Dkt. No. 46, ¶ 35.*

- March 27-28, 2024: The Defendant reiterates his intention that the bay'ah video be distributed after his death.

  

  I will send the video a day or a few days before the operation.

  Release the video after I am confirmed to be dead. I will you more later, like where I live and what weapons I will use. 10:24 AM

  *Bates No. 2150.*

- March 29, 2024: The Defendant stated he began purchasing attack materials. Defendant claimed he intended to use propane canisters as grenades, or that he intended to attach them to his body as an explosive vest. *Dkt. No. 46, ¶ 36.*

- March 30, 2024: The Defendant stated that he planned to use a metal pole soaked in flammable liquid to strike people, and that he would purchase the metal pipe. *Dkt. No. 46, ¶ 37.*

- April 1-2, 2024: The Defendant confirmed that he had purchased two butane canisters. The Defendant also described his attack plan. He intended on entering churches, incapacitating people, using knives and machetes to kill them, and set fire to the church. He would then flee to the next church and repeat the process until he was killed. The Defendant claimed another ISIS associate was working on translating his bay'ah video script. *Dkt. No. 46, ¶ 38.*

- April 2-3, 2024: The Defendant repeated his attack plan while discussing his bay'ah. The Defendant also went to a hardware store and purchased a metal pipe he intended to use in the attack. He revealed a fixed blade knife he also planned to use. The Defendant recorded his bay'ah video, in which he held the knife in front of the ISIS flag that he requested be used as a propaganda picture after his death. *Dkt. No. 46, ¶¶ 41-42.*

- April 5, 2024: The Defendant finalized his attack plan. He intended to use the metal pipe to incapacitate his father and handcuff him. Defendant states:




> The Defendant stated he intended to use his father's vehicle and AR-15 in the attack. *Dkt. No. 46, ¶ 43, Bates No. 2257.*

The Defendant's planning reflects a focused and sustained intent to commit violence on behalf of ISIS. This was not a fleeting idea, fantasy, or something aspirational. It was a considered and deliberate plan that he intended to carry out. After his arrest, the Defendant's closet was searched and the following items were located: (1) metal pipe, (2) handcuffs, (3) folding saw, (4) machete, (5) fixed blade knife, (6) two cannisters of butane fuel, (7) hand sanitizer and lighters, (8) head covering and a balaclava, and (9) a black and white ISIS flag. An AR-15 as well as other rifles and handguns were found in the Defendant's father's bedroom. All consistent with the Defendant's stated plan.

The Defendant developed a final plan that involved transferring money to ISIS (which he had in his bank account), distributing his bay'ah video (which he created), assaulting his father with a metal pipe (which he possessed), restraining him with handcuffs (which he owned), stealing his father's AR-15 and car (which were accessible to him), traveling to local churches (which he had mapped), attacking on a Sunday when those churches would be occupied (which matched his timeline), shooting inside those churches, and continuing until killed (which he stated he desired). His plan was not theoretical. Given the gravity of this conduct and the narrow margin by which this attack was averted, a near maximum sentence is warranted.

**B. The History and Characteristics of the Defendant**

The Defendant is young and has no criminal history. The Government has accounted for this by not seeking the statutory maximum sentence. That said, the concepts of murder—and

especially a planned terrorist attack—are morally repugnant to anyone with even the slightest conscience. This was not teenage mischief. The Defendant's words and actions went well-beyond anything that could be described as youthful impulsivity or "teenage-brain" behavior. The deliberate plan to massacre people attending worship cannot be excused as delinquency; it is conduct that any ordinary person would recognize as profoundly evil.

And importantly, *nothing* in the Defendant's history or characteristics suggests he was driven to this crime by circumstance or deprivation. He grew up with two loving parents who, while divorced, supported him, provided him with a nice home, ample resources, and an education beyond high school. The Defendant was not abused, nor neglected. The Defendant's father drove the Defendant to school and work regularly, to include the day before his planned attack. He enjoyed advantages beyond those available to many children. Moreover, the Defendant has no psychological condition that plausibly explains this offense as the product of mental illness. Rather, his conduct was his choice. His background offers no meaningful mitigation.

While individuals generally seek to minimize their unlawful conduct after arrest—that was not the Defendant. The Defendant's statements and demeanor after arrest reveal his true character. The Defendant didn't try to explain away his actions; he embraced them. On April 6, 2026, shortly after his arrest, the Defendant was taken to the Sheriff's Office and given an initial medical assessment by law enforcement personnel. The questionnaire (which the Defendant signed) contained general health and safety questions as part of the standard admission process. The Defendant was asked if he had considered or attempted suicide – to which he responded "Yes" – and responded with "CONSIDERED TODAY-THROUGH TERRORIST ATTACK TODAY BY SUICIDE BOMBING." *Bates No. 1454-1457 (as in original)*.

Then again, on April 9, 2024, the Defendant expressed no remorse. He gave an interview to the local newspaper and stood defiant. During the interview the Defendant stated that he found Islam and radicalized himself online. He stated the following regarding his thwarted attack:

- "The purpose is revenge. It's an eye for an eye."
- "It's retribution."
- "If our people will be slaughtered, it should happen to you."
- "It's justified."
- "It's a consequence if I got caught."
- "The point was to kill until I was killed."

*See* Exhibit B. Despite those closest to him (his parents) trying to steer him back to Christianity by sending him to in-person school and therapy, he resisted. They tried to redirect him, but he was entrenched in his faith in ISIS.

The Defendant has no regard for anyone but himself. He viewed his plan to attack churches as justified. He was willing to harm and/or possibly kill his father to do it. A substantial sentence is necessary to address the serious risk he poses.

**C. Seriousness of the Offense / Respect for the Law**

The Defendant's crime is serious. His choice of target underscores the gravity of his intent. He did not select military personnel or infrastructure, rather he chose civilians attending church, members of the community gathered in worship, because their murder would advance a message of religious supremacy on behalf of ISIS. This nation bears the scars of terrorist incidents linked to ISIS, for example, the 2014 attack in Queens, New York (police officers attacked with a hatchet), 2015 attack in Garland, Texas, (gunfire attacks at an exhibit featuring cartoon images of the Prophet Muhammad), 2015 attack in San Bernardino, California (open fire at a holiday party, 14 killed and 22 injured), 2016 Pulse nightclub shooting in Orlando, Florida (49 killed and 53 wounded), 2016 Ohio State University attack (civilians stabbed and ran over with a car), 2017 New York City Subway bombing, and the 2025 Bourbon Street truck-ramming (14 killed). These

atrocities and many others caused by Islamic terrorist ideology have sadly shaped an era of American life – one often fraught with fear and trauma. The gravity of what Defendant attempted demands a significant sentence to promote respect for the law, given our historical trauma and national experience.

**D. Just Punishment / Adequate Deterrence**

The Government is recommending 216 months (18 years) with lifetime supervision. While the Defendant's applicable USSG range with acceptance is 240 months (20 years), given the Defendant's youthfulness coupled with his acknowledgement of guilt, a sentence below the statutory maximum is appropriate. A 216-month recommendation is effectively a reduction of two offense levels (from 240 months) under the USSG. This recommendation also considers similar sentences in cases around the country. For example, in June 2019, Mohamed Rafik Naji was sentenced to 240 months (20 years) for providing material support to ISIS, specifically attempting to reach ISIS-controlled territory and discussing plans for a terror attack using a garbage truck; November 2022, Mustafa Mousab Alowemer, 24, was sentenced to 208 months (17 years, 3 months) for attempting to provide material support to ISIS in connection with his plan to attack a church in Pittsburgh; December 13, 2023, Moyad Dannon, 26, was sentenced to 200 months (16 years, 7 months) for attempting to provide firearms to ISIS (his brother, Mahde Dannon was sentencing to 240 months (20 years) in October 2021 for the same offense); Michael Sam Teekaye, Jr., 22, was sentenced to 180 months (15 years) after arrest at the airport for attempting to travel overseas to join ISIS. The Government's recommendation is consistent with other cases where the Defendant attempted to provide material support to ISIS.

The sentence of 216 months with lifetime supervision also supports adequate deterrence. The Defendant *selected* this ideology. He was not born into it. He was not forced into it. He sought

it out and chose it. The Defendant rejected efforts by his parents and counselors to dissuade him. Only a significant sentence can adequately serve the purpose of general deterrence, not only for the Defendant, but also for other individuals that subscribe to terrorist ideology.

## RESPONSE TO DEFENDANT'S PSYCHOLOGICAL EVALUATION[3]

The Defendant retained a psychologist to prepare a psychological evaluation and risk assessment to assist in mitigation efforts (herein Defendant's Forensic Evaluation (DFE)). In essence, the examiner claims mitigation based on youth and coercion, and implies that psychometric testing and professional judgment show the Defendant poses a low risk of future violence. The Government addresses these opinions below.

### A. Youth, Impulsivity, and Social Pressure Do Not Mitigate Defendant's Crime

The examiner's opinion defies common sense. If isolation, impulsivity, and depression were the true drivers of the Defendant's conduct, we could expect to see thousands of teenagers engaging in terrorist violence. These traits are exceedingly common in adolescence, yet most young people experiencing them would not harm a fly—much less commit assault, murder, and certainly not join a terrorist organization to attempt a suicidal mass-casualty attack. The opinion simply does not pass the test of everyday experience.

The examiner takes common developmental traits such as youthful impulsivity or a desire to belong and overextends them as excuses. Consider a simple example. Anger in response to an insult is normal. It is common to feel irritation when another driver cuts us off. But that normal emotional reaction does not excuse a person if they follow the other driver home and torture him.

---

[3] On or about August 21, 2026, the defense provided the Government and the probation officer with a 49-page forensic psychological evaluation and risk assessment of the Defendant for purposes of mitigation. This section of the sentencing memorandum addresses the mitigation advanced by the defense examiner.

Extreme conduct does not follow common emotions and maturity processes. Treating a deliberate, planned act of violence as if it were normal developmental emotions and processes stretches reasoning past its breaking point. This was terrorism, not teenage rebellion.

1. <u>Youth</u>

The Defendant's examiner focuses at length on youthful impulsivity and recklessness, but her assessment overlooks critical facts and relies on methodological errors.[4] For example, she attributes the following to *Miller v. Alabama,* 132 S. Ct. 2455 (2012):

> Per Miller, "First, [youth] have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking… [T]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18."

*DFE, pg. 8*. This full quotation above is not originally from *Miller*. The critical part of the quote above that the examiner excludes appears first in *Roper v. Simmons*, and it contains a crucial qualification she omitted. *Roper* states: "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. <u>*By the same token, some under 18 have already attained a level of maturity some adults will never reach*</u>." *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (emphasis added).

The examiner's citation is misleading. Read in context, *Roper* cautions against categorical assumptions about youth. It recognizes diminished culpability in juveniles as a class while expressly acknowledging that "some under 18" may be fully mature. Courts must rely on individualized proof, not group averages.

---

[4] At the outset, the science she relies on must be treated with caution, because even that literature draws clear distinctions between mid-adolescence and late-adolescence. The Defendant was an adult; he was 18, not 13 to 15. Collapsing that developmental range is analytically sloppy. An 18-year-old is well within the age range in which individuals can form sustained intent, plan complex actions, understand consequences, and make moral choices. He was a youth, but an 18-year-old youth — not the much younger adolescents often cited.

However, the examiner does the opposite. She takes group-level research (e.g., "adolescents are more reckless") and applies it directly to the Defendant ("therefore, this Defendant acted out of recklessness"). The examiner inferred individual traits from aggregate statistics without substantial individual evidence. Her reasoning also downplays the case-specific facts that bear on this Defendant's choices and capacity. The examiner offers no substantial individualized assessment tying the Defendant's background, neuropsychological testing, or contemporaneous behavior to an impulsive or reckless act. Instead, she relies on stereotypes of recklessness and impulsivity.

The individualized facts of this case contradict her impulsivity claim. A crime planned over weeks is not impulsive. Impulsivity involves an inability to weigh future consequences – acting on a whim – resulting in immediate, smaller rewards in the moment. An idea, by contrast, involves understanding the consequences and choosing to proceed anyway. Nothing in the record indicates that the Defendant's emotional system overwhelmed rational judgment. The Defendant's words and actions involved operational security, careful planning, secrecy from family members, and many deliberate steps over a nearly two-year period. That is the opposite of spontaneity. Yet the examiner collapses "impulsive decision" into "bad idea," ignoring the clinically significant distinction between a choice refined over time and a reaction formed in minutes.

The examiner also mischaracterizes the nature of this crime relevant to her analysis. Ideologically motivated violence is not comparable to recklessness. Recklessness means acting with disregard for a known risk. A teenager driving 65 mph through a school zone is reckless because they know the danger and ignore it. By contrast, a suicidal or homicidal attack is intentional. A youth driving through a school zone intending to strike a child is not reckless; it is purposeful. The offense in this case was proactive violence: goal-directed, calculated, and

intended to serve a broader ideological purpose. Individuals driven by terrorist ideology view acts of violence as moral and necessary, which requires reasoning and sustained control, not short-sighted impulse or recklessness.

The Defendant's conduct cannot be explained as a simple developmental lapse. Disregarding empathy and inhibition necessary for a planned attack reflects a very different psychological profile. A youth who engages in predatory, ideological violence is not acting on recklessness or fleeting impulse. A youth who plans and details an attack is not reckless. A youth who boasts about it to the press after arrest was not pressured. The Defendant was operating with agency intact.

2. Social Pressure

The Defendant's examiner also attempts to attribute the Defendant's conduct to pressure from the FBI. Framing the Defendant's attempted terrorist attack as the product of pressure does not comport with the facts. A normal person contains strong biological and moral guardrails that pressure cannot override. A terrorist attack is not simply a matter of wanting to fit in. It is mass violence in service to an ideology.

Pressure may explain compliance in ordinary situations, but it does not explain atrocities such as what the Defendant planned. A person may provide validation or encouragement, but here, the Defendant possessed the internal drive independent of any pressure. That drive includes a diminished capacity for empathy, an elevated tolerance for cruelty, and a willingness to discard basic social norms. These traits were not implanted by CHS social pressure.

The FBI gave the Defendant opportunities to reconsider his plan – but the Defendant was committed. For example, four days before the Defendant's planned attack, on April 3, the Defendant was online discussing his ISIS library and uploading more materials before the attack.

The Defendant was asked by the FBI online source, "Brother you sure you want to go through with the operation." To which the Defendant unequivocally responds, "Yes I'm sure I want to do this." *Bates Nos. 3284, 3326*. In another instance, the day before his arrest, the Defendant has an online communication with a different FBI source. The FBI source asks Defendant, "Are you feeling like you need to postpone?" The Defendant responds with, "No …I can't delay it beyond Tuesday anyway." *Bates No. 2304*.

Moreover, the Defendant's examiner fails to account for evidence of the Defendant's agency. He was no puppet. He exercised control in many areas of life (e.g., school, work, friendships). He exercised the same control in his criminal acts. The agents observed and adopted roles to maintain rapport. This was necessary to uncover Defendant's plans. Defendant's choices were his own.

**B. Defendant's Risk for Violence**

The Defendant's examiner uses psychometric testing that incorporates subjective judgment. In addition to general problems with forensic psychology,[5] there are problems with the use of the SAVRY and TRAP-18 tools used in this case.

1. <u>SAVRY</u>

[5] There is a problem inherent in forensic psychology, as it is a soft science. The difference between hard sciences and soft sciences rests in how a discipline can measure observations, replicate results, and establish universal laws. In physics, the law of gravity predicts consistent interactions based on mass, distance, and gravitational constant. In chemistry, rapid oxidation at a given temperature can be reproduced in controlled environments. In mathematics, truth is fixed because logical rules, once applied, yield results that do not vary under any circumstance. Psychology does not operate with the same level of replicability or universal predictability.

Psychology, as a discipline, addresses core subjects such as trauma, personality, and emotion, none of which can be directly seen, weighed, or measured. Instead, the field relies on proxies including self-reporting, behavioral observations, and diagnostic criteria. The difficulty is that these proxies depend heavily on human interpretation and subjectivity. This creates substantial issues when psychological assessments are used in a courtroom. This is not to suggest that psychologists are dishonest. It is simply an acknowledgment of the limits inherent in the discipline.

The Structured Assessment of Violence Risk in Youth (SAVRY) is a prominent forensic psychological tool used to evaluate an adolescent's risk for violent behavior between the ages of 12 and 18. Rather than using rigid math formulas, it uses a Structured Professional Judgment framework to guide evaluators through risk factors and protective factors.

Once again, it is subject to "professional judgment," which is another term for subjectivity. Glossing over that, it remains an inappropriate tool here. The Defendant engaged in attempted targeted violence. The applicability of the SAVRY is dubious with targeted violence, and the Defendant's examiner seems to admit as much. *DFE, pg. 17*. However, even in this admission a considerable point is missing – the violence here is motivated by political, religious, and terrorist ideology. The SAVRY does not account for ideological indicators; it accounts for impulsivity, substance use, and poor anger management. To put it plainly, SAVRY is good for assessing juvenile delinquency. Not terrorists.

2. TRAP-18

In opining on Defendant's future risk for violence, the examiner also uses the Terrorist Radicalization Assessment Protocol–18 (TRAP-18). TRAP-18 is a professional judgment instrument designed to identify individuals who may be on a pathway toward lone-actor terrorism. That said, it is a *pre-attack* identification tool. It is not a recidivism-risk instrument. To the extent such use is implied in her opinion, the examiner misuses this tool.

Consider the following analogy. A predictive medical tool designed to identify patients at risk of a heart attack is useful when a patient arrives at an emergency room with chest pain. But once a patient has already suffered a fatal heart attack, using a tool meant to predict heart attack risk is meaningless. That is what the examiner did here, she applied the TRAP-18 after an attack had already been attempted. She then declared the Defendant, who firmly stated he was going to

kill for an ideological cause, to be "low risk" simply because he did not match a pre-attack profile. The retrospective use of the TRAP-18 here is not probative. It is the tool that failed, not proof that the Defendant is harmless. Reliance on TRAP-18 in this instance is erroneous.

**C. Examination Does Not Support Mitigation**

In sum, the opinions expressed by Defendant's examiner should be given little weight. Despite his youth, the Defendant engaged in sustained, deliberate planning to carry out a mass-casualty terrorist attack. This was not a momentary lapse or recklessness. It was planning and intent. The Defendant was not pressured; he was communicating with ISIS before the FBI detected him. The plan was his own.

## CONCLUSION

Defendant's crime supports a sentence of 216 months with lifetime supervision. Application of the 18 U.S.C. § 3553 factors support the Government's recommendation for Attempt to Provide Material Support to ISIS. The Government submits the sentence is sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Respectfully submitted this 3rd day of November, 2026.

JOHN C. SHIRTS
UNITED STATES ATTORNEY
By:

*/s/ Heather S. Patricco*
HEATHER S. PATRICCO
Assistant United States Attorney

*/s/ David G. Robins*
DAVID G. ROBINS
Assistant United States Attorney