Carter Powers Beggs
*Trial Attorney*
J. Stephen Roberts, Jr.
*Trial Attorney*
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
509.624.7606
Attorney for Alexander Scott Mercurio

United States District Court
District of Idaho
Honorable David C. Nye

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Alexander Scott Mercurio,<br><br>Defendant. | No. 2:24-cr-93-DCN-1<br><br>Sentencing Memorandum<br><br>Filed: November 3, 2026 |

## I. Introduction

For nearly two years, Alexander Mercurio's best friend was a government informant. Starting when he was just seventeen years old, Mr. Mercurio spent his days holed away in his basement bedroom, talking with his best friend about increasingly radical terrorist ideologies. Together they brainstormed a plan that was as horrific as it was unlikely to succeed: a suicidal attack on local churches using his father's firearms and an untested improvised explosive/flamethrower.

As the planned date of attack neared, Government agents intervened, first bringing Mr. Mercurio to mental health services before next bringing him to federal court. Two and a half years later, this Court is tasked with what comes next.

On one side sits the horror of Mr. Mercurio's extremist rhetoric, the seriousness of his stated plan, and a guideline enhancement for terrorism that skyrockets his sentencing range to the statutory maximum. On the other side sits the reality of Mr. Mercurio's circumstances: a depressed 18-year-old, isolated from the outside world, who has renounced his extremist viewpoints, and is now assessed at a low risk for future danger.

Courts around the country have been greeted by similar situations and similar guideline ranges. Recognizing these guidelines didn't fit the facts of their case they varied downwards. This Court should do the same. Mr. Mercurio respectfully requests the Court vary downwards from the advisory guideline range of 240 months and

impose a sentence of **108 months (9 years)**, fifteen years of supervised release, no fine, and a $100 special penalty assessment.

## II. Guideline Calculations.

A final Presentence Investigation Report ("PSR") was filed on October 28, 2026.[1] Mr. Mercurio has no outstanding objections to the PSR. Mr. Mercurio agrees that the advisory guideline range for Attempt to Provide Material Support or Resources to a Designated Foreign Terrorist Organization in violation of 18 U.S.C. § 2339B(a)(1), is **240 months**, when utilizing a total offense level of 37 and a criminal history category of VI.[2] While Mr. Mercurio agrees this is a correct calculation of his guidelines, he submits that a downward variance in his case to 108 months is appropriate due to his unique circumstances and the outsized impact of the Guideline's terrorism enhancement.

## III. Sentencing Considerations

A sentence of 108 months is "sufficient, but not greater than necessary" to address the factors outlined in 18 U.S.C. § 3553(a). The Court should consider several factors in fashioning the requested sentence.

[1] PSR, ECF No. 46

[2] PSR at Pg. 13.

### A. Mr. Mercurio's Background and Offense Conduct.

In 2005, Alexander was born into a family of dysfunction. The son of a Russian immigrant mother and alcoholic father, many of Alexander's childhood memories revolve around his parents' constant domestic conflict. Their fighting escalated, eventually leading to criminal charges for Alexander's father including one for domestic battery in the presence of a child in 2017 when Alexander was just 12 years old.[3] Unsurprisingly, during this period his mother began to see changes in Alexander's demeanor: he became more moody, less talkative, and isolated himself from the outside world—all hallmark indicators of trauma response.[4]

The combination of these adverse childhood experiences and a shut-in father had predictable results. Growing up, Alexander never had friends over. He had no hobbies outside the house. He only went to school, came home, and went to his bedroom in the basement. Mr. Mercurio's main in-person social interaction was with his father, who was agoraphobic and worked from home—only leaving the house for necessary errands like grocery shopping. Unfortunately, his father's presence only led Alexander farther away from societal normalcy.

---

[3] *See* Exhibit C, at 1–2 (Report of Dr. O'Donnell Dated August 19, 2026). Dr. O'Donnell's report has been filed under seal due to the discussion of sensitive medical and mental health information.
[4] *Id.* at 2.

**1. Alexander is exposed to radical ideology at an early age.**

Alexander first recounts his father exposing him to white supremacist media when he was in the 5th grade.[5] The trickle of extremism led to a torrent, with his father eventually giving him two books on the subject: *My Awakening* by David Duke, a Ku Klux Klan member, and *Mein Kampf*.[6] Young and impressionable, Alexander began harboring white supremacist views at the age of 12. However, just as quickly as his views developed his views rebounded away in the other direction.

What followed was Alexander seemingly throwing his lot into a roulette wheel of political ideology.[7] Following his distancing from white supremacy, he began identifying as an anarchist. Then he was a leftist. Then he was a socialist. Then he was a Marxist. Then in 2020 at the age of 15 during a global pandemic, he found Islam. Then he found radical Islam.

Alexander's descent into radical Islam represents a culmination of everything in Alexander's life up to this point—a perfect storm of radicalization. Social isolation, early parental exposure to radical ideologies, the trauma of domestic violence, a further isolating global pandemic, and an internet full of radical propaganda. The combination festered. In July of 2022, the government first made contact with Mr. Mercurio as he

---

[5] *Id.*
[6] *Id.*
[7] *See id.*

attempted to re-ignite communications with a deceased ISIS supporter who had been replaced by a government informant.

**2. A 17-year-old Mr. Mercurio speaks with a government informant daily.**

Following initial contact, Mr. Mercurio and the government begin an intense online relationship, communicating frequently on a variety of Islamic and non-Islamic topics.[8] Holed away in his bedroom, Mr. Mercurio reached out to them for companionship. When he felt infirm in his Islamic faith—he messaged them. When he wanted to discuss radical ISIS ideology—he messaged them. When he was feeling depressed—he messaged them. When he was having difficulty with his parents—he messaged them. In response, the agents complimented him, fostered friendships, and encouraged him to continue developing ISIS propaganda—all while keeping a watchful eye and reporting to their FBI handlers.

**3. Mr. Mercurio's conversations escalate with an in-person meeting.**

After months of online only communication, a new government informant engineered a happenstance meeting with Mr. Mercurio at his place of employment. After this meeting, his conversations quickly intensified switching from the development of propaganda to the planning of an attack. While a horrific thing to plan, Mr. Mercurio's initial ideas stretched credulity. He first began discussing "flame"

[8] *See id.* at 4.

based weapons, suggesting a "huge flaming sword or club" as it can "cause further infection and damage."[9] The informant critiqued Mr. Mercurio's plan, inquiring whether he had researched proper tutorials and stating that "this plan needs fine tuning. A lot."[10] After weeks of discussion about the feasibility of a flame sword with both online and in-person informants, Mr. Mercurio's next "solid" plan was to approach a crowd of churchgoers with a baton, hit them individually on the kneecaps and elbows, and then use knives.[11]

Finally, after much discussion and critique by the two informants, Mr. Mercurio settled upon a plan: he would wake up early on a Sunday, transfer his money to ISIS, beat up his father, take his guns, feed the animals, call in sick to work, drive his father's car from church to church, and shoot at churchgoers until falling to the police.[12] He filmed a bay'ah video stating his intentions with the assistance of an informant, using a provided ISIS flag. Days later, Mr. Mercurio was arrested at his work without incident.

### B. Mr. Mercurio's spiraling mental health influenced his conduct.

Mr. Mercurio's rhetoric when speaking with government informants was hateful, horrific, and inflammatory. However, it also provides a window into a

---

[9] *Id.* at 39-40. Mr. Mercurio was 130 lbs at the time of arrest.
[10] *Id.* at 40.
[11] *See id.* at 46.
[12] *Id.* at 7.

deteriorating mental state of an 18-year-old riddled with malaise, self-hate, and depression. In his own words:



I hate how I am, how I feel, look, live, and act, I hate my life and my self and nearly everything and everyone around me, I have no energy or excitement for anything... I am nothing, and I have done nothing with what I have. I have so many countless blessings and favors and I do nothing with them! I've become so lazy and insincere, I'm falling apart at the seams. I've stopped asking and praying for martyrdom because I don't feel like I want to fight and die for the sake of Allah, I just want to die and have all of my problems go away. I often wish I could go back to my easy life....of course it was wrong and evil, but I'm not succeeding at doing good. I'm failing as a Muslim, if I can even call myself that.

As Dr. O'Donnell notes, Mr. Mercurio's messages indicate "significant depressive symptomology, to include suicide ideation."[13] When evaluating Mr. Mercurio's conduct we would be remiss to not consider whether this was a plan borne out of a desire to inflict violence, or a desire to end his own life. The boots on the

[13] Exhibit C at 13.

ground response to his mental state was clear: FBI agents first took Mr. Mercurio to a mental health crisis center before taking him to a jail.[14]

Regardless of the role this Court gives Mr. Mercurio's spiraling mental health in his offense, what we do know is that his mental health is now doing much better. Thanks to a change of venue, he's been able to receive treatment and medication in jail with his symptoms in remission. To the extent it played a role in his offense, Mr. Mercurio's malady is being treated in custody, and will continue to be treated on supervised release. This potential for rehabilitation weighs in favor of lenience.

### C. Unwarranted Sentencing Disparities Would Result if the Court Imposes a Guideline Sentence

According to 18 U.S.C. § 3553(a)(6), the Court is directed to avoid unwarranted sentencing disparities among similarly situated defendants. Mr. Mercurio points out the following cases where the defendants were charged with material support offenses to ISIS and youthfulness was a factor and asserts that unwarranted sentencing disparities would occur if the Court imposed a Guideline Sentence of 20 years or the government's recommended sentence of 18 years.

| Name | Docket # | Age | Sentence (months) | Plot (Y/N) | Facts |
|---|---|---|---|---|---|
| Teausant, Nicholas | 2:14-cr-0087-JAM (E.D. Cal.) | 20 | 144 | No | Arrested near the Canadian border on his way to Syria to join ISIL |

[14] *See* Exhibit C at 11.

| | | | | | |
|---|---|---|---|---|---|
| Young, Jaelyn | 1:15-cr-00098-SA-DAS (N.D. Miss.) | 19 | 144 | No | Pled to conspiracy to provide material support to ISIL and travel to Syria |
| Bridges, Cole | 1:21-cr-00065-LJL (S.D. NY) | 20 | 168 | Yes | Pled to attempt to provide material support and conduct deadly attack on U.S. Troops in Middle East and targets in NYC. In U.S. Army at time of offense. |
| Osadzinski, Thomas | 1:19-cr-00869-RWG (N.D. Ill.) | 20 | 90 | No | Convicted at trial of attempt to provide material support disseminated terror materials and recruited on social media. |
| Almadaoji, Naser | 3:18-cr-00158-WHR (S.D. Ohio) | 19 | 120 | Yes | Pled guilty to attempt to provide material support. Plot to travel and support ISIS-K. Previous travel to Egypt and Jordan. Terror plot in U.S. with car bomb never realized. |
| Daniels, Aaron | 2:16-cr-00222-EAS (S.D. Ohio) | 20 | 80 | No | Pled to attempt to provide material support after plan to travel to Libya |
| Musleh, Akram | 1:16-cr-00190-SEB (S.D. Ind.) | 18 | 100 | No | Pled guilty to attempt to provide material support. Despite multiple interventions while in high school and beyond continued to pledge allegiance to ISIS and travel to Syria. |
| Williams, Elvin Hunter | 2:21-cr-0099-JCC (W.D. Wash.) | 20 | 48 | No | Pled guilty to attempt to provide material support. Arrested leaving airport to travel to Egypt to join ISIS. Although a travel case also expressed intent to commit attack in U.S. |

Additionally, at worst Mr. Mercurio is a follower rather than a leader in a foreign terrorist organization. Federal courts draw distinctions between a defendants' individual role within a terrorist organization and general culpability stemming from broader organizational affiliation. In a study examining federal sentencing trends in ISIS-related prosecutions between 2014 and 2024, researchers identified a "leadership effect," finding that defendants in leadership positions tend to receive more severe sentences than those who occupied subordinate roles as followers.[15] On average, "followers" were sentenced to 12 years of imprisonment; by contrast, "leaders" received sentences averaging 25 years.[16]

### D. Mr. Mercurio is evaluated at a low risk of future violence.

Mr. Mercurio's offense is notable in that it is simultaneously incredible serious while also never actually occurring. We will never know whether Mr. Mercurio's attempt would have been followed through on, only the immense horror of his stated actions. In sentencing situations like these, forward-looking questions must be answered: what life will look like for Mr. Mercurio after incarceration, whether the public will be protected, and whether he will be rehabilitated.

[15] Callie Vitro et al., *Sentencing Terrorist Leaders and Their Followers: Evidence from Islamic State Defendants in U.S. Federal Courts, 2014–2024*, 26 Glob. Crime 92 (2025).
[16] *Id.*

In answering these questions which boil down to Mr. Mercurio's future risk of violence, two things are important to note:

***First***, unlike many crimes, Mr. Mercurio's offense was highly particularized, unlikely to be repeated, and amenable to supervision. For anywhere from 15 years to the rest of his life, Mr. Mercurio's every move, and every device will be scrutinized by the watchful eye of a federal probation officer. His original offense came after years of social isolation, and two years of constant communication with government informants. Mr. Mercurio's offense is not a run of the mill drug or gun offense and is unlikely to be repeated.

***Second***, Mr. Mercurio was evaluated by Dr. O'Donnell who deemed him a low risk for targeted violence without the social influence of confidential informants, and a low risk for future violence.[17] This low risk of future violence weighs in favor of leniency.

## IV. Downward Variance is Appropriate.

While there are a variety of 3553(a) factors that weigh in favor of a below-guideline sentence, three factors in particular support downward variance: Mr. Mercurio's youthfulness, Mr. Mercurio's susceptibility to government influence, and the availability of rehabilitative programming in the Bureau of Prisons.

[17] The full reasoning for this opinion is best saved for Dr. O'Donnell's report as well as her anticipated testimony at sentencing.

**A. A Downward Variance is Requested Due to Youthfulness**

The earliest date of the offense conduct is July 2022 when Mr. Mercurio turned 17. [18] By the date of his arrest on April 8, 2024, he was age 18. Mr. Mercurio requests a downward variance on this basis.

According to former Amendment 829 which was codified by the Sentencing Commission as USSG §5H1.1 in 2024:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation.

USSG § 5H1.1 (2024). [19]

The question remains how much of an age-appropriate intervention – custody in this case -- is appropriate. Mr. Mercurio submits that 9 years' prison is the appropriate amount. The recent Youthful Individuals 2024 amendment to Section 5H1.1 came after the Commission specifically noted:

---

[18] *See* PSR at ¶¶ 8-11.

[19] Mr. Mercurio recognizes the Sentencing Guidelines were amended in 2025 to eliminate departures, however, courts may use this same logic as a basis for a downward variance under Section 3553(a).

> "Research has shown that brain development continues until the mid-20s on average, potentially contributing to impulsive actions and reward-seeking behavior, although a more precise age would have to be determined on an individualized basis."[20]

Additionally, Mr. Mercurio's request for a downward variance for youthfulness is supported by Dr. O'Donnell's Forensic Evaluation, specifically his age and immaturity at the time of the offense. [21] Dr. O'Donnell opined that his youthfulness contributed significantly to the offense, especially in regard to his social and emotional skills which were stunted. His adolescence was marked by exposure to radical beliefs by his father and extreme social isolation. Furthermore, his plot to attack churches was unsophisticated and not fully developed due to living full-time with his father, having no driver's license, and a bank account that was monitored by his parents.

A final additional layer of support for Mr. Mercurio's request for a departure or variance based on youthfulness, is the U.S. Department of Justice's "Five Things About Youth and Delinquency:" [22] This report explains in brief that youth risk-taking

---

[20] *See, e.g.*, U.S. SENT'G COMM'N, *Youthful Offenders in the Federal System* 6–7 (2017); Daniel Romer et al., *Beyond Stereotypes of Adolescent Risk Taking: Placing the Adolescent Brain in Developmental Context*, 27 DEVELOPMENTAL AND COGNITIVE NEUROSCIENCE 19 (2017); Laurence Steinberg & Grace Icenogle, *Using Developmental Science to Distinguish Adolescents and Adults Under the Law*, 1 ANN. REV. DEVELOPMENTAL PSYCH 21 (2019). *See also,* Proposed Amendment dated December 26, 2023: Youthful Individuals: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20231221_rf-proposed.pdf.

[21] See Exhibit C at 8-10.

[22] "Five Things About Youth and Delinquency," U.S. Department of Justice – National Institute

is part of the early brain development process. In this case, the Court can address the concerns associated by Mr. Mercurio's conduct by acknowledging the effects of youth and the instant offense and not imposing a 20-year sentence as the Guidelines in this case suggest.

### B. A Downward Variance is Requested Due to Mr. Mercurio's Susceptibility to the Government's Informants

This Court must also consider the Government's use of informants and how that contributed to the instant offense, namely the evolution of the offense conduct from providing material support through financial and propaganda means to a terror plot. To be clear, Mr. Mercurio was certainly guilty of attempted material support between 2022 to 2023, but the use of informants added fuel to a smoldering fire by targeting a vulnerable youth and providing no intervention prior to arrest.

Dr. O'Donnell correctly points out that Mr. Mercurio was a particularly vulnerable individual due to the following factors: (1) adverse childhood experiences – to include bearing witness to domestic violence, divorce, and exposure to radical ideologies; (2) social isolation both before and during the pandemic; (3) immaturity; and (4) his mental health struggles with depression and suicidal ideation. Upon this backdrop, Mr. Mercurio found a community in the darkest corners of the internet,

---

of Justice (July 2024): https://nij.ojp.gov/topics/articles/five-things-about-youth-and-delinquency.

having had multiple informants and government agents monitoring him from 2021 to 2024. This network sadly became his friend group. Dr. O'Donnell has provided the Court with an Index Offense recording a timeline of events from January 2021 to April 2024. [23] A review of the timeline clearly demonstrates the social pressure and encouragement, mainly from CHS-1 and later from CHS-2 placed on Mr. Mercurio and how that contributed to the offense conduct. He messaged constantly with the informants. As events progressed in 2024 the informants met with Mr. Mercurio at his work (Walmart) and later rented a fake apartment where they had elaborate discussions regarding his faith, ISIS, jihad, family, and the terror plot.

The use of government and confidential informants to prosecute terror offenses in wake of the September 11 attacks has been the subject of extensive criticisms. [24] Critiques ranging from manufacturing terror plots and entrapment to targeting vulnerable individuals have been discussed. [25] Finally, the government's informants are motivated in large part due to financial incentives cannot be ignored. [26]

---

[23] *See generally* Exhibit C at 28-49 – Appendix B (Record of Events January 2021-December 2023) and (Record of Events January 2024 through April 2, 2024).

[24] *See* Wadie E. Said, The Terrorist Informant, 85 WASH. L. REV. 687 (2010), available at https://scholar.law.colorado.edu/faculty-articles/1896.

[25] *See id.*; *see also* Jesse J. Norris, Explaining the Emergence of Entrapment in Post-9/11 Terrorism Investigations, Critical Criminology (2019) 27:467–483.

[26] See Norris, at 473-474.

Mr. Mercurio's case involves these concerns. Dr. O'Donnell's report lends credence to these susceptibility issues in great detail, both in her report, risk assessment, and record of events. In this case, informants provided support, encouragement, leveraged social pressure, and CHS-2 even provided an ISIS flag that he/she eventually used to record Mr. Mercurio's bay'ah video. CHS-1 and CHS-2, motivated by payment [27] exploited his vulnerabilities and morphed what certainly was a material support case into something more sinister.

### C. The Court Should Vary Downward Due Mr. Mercurio's efforts towards Rehabilitation, Exclusion from Programming Reductions like FSA, and Lack of Deradicalization Programming in BOP

The next factor the Court should consider in granting a downward variance to nine years' prison is Mr. Mercurio's potential for rehabilitation and the lack of programming while in BOP custody tailored to a terrorism offense. By the date of sentencing Mr. Mercurio will have languished in federal custody for 947 days (2 years, 7 months, and 3 days). When undersigned counsel first met Mr. Mercurio, he was still under mental health observation at the Kootenai County Jail and on suicide watch. He had just given an ill-advised press interview and had never spent a single day inside a jail cell.

---

[27] The Government's discovery indicates the two main informants in this case have been paid significant sums of money as sources for the FBI. It is unknown how much they were actually paid for Mr. Mercurio's case.

Fast forward to present day. Mr. Mercurio has taken advantage of what little programming BOP has to offer for those fortunate enough to be housed at FDC-SeaTac and not local custody. He completed three certificates for Anger Management, House of Healing, and Faith Based Conflict Management – all between May and August of 2025. [28]

Most significantly though, the Court can see that Mr. Mercurio has expressed **genuine remorse** for his actions. For example, during his psychological assessment he told Dr. O'Donnell that he is "no longer a jihadist [and] described his former ideology as "a dead-end route" and called his attack plan "badly thought out" and "horrific."" [29]

It is also important to see how the instant offense over-penalizes Mr. Mercurio from a rehabilitation and programming standpoint while in BOP custody. First, his offense of conviction is categorically excluded from First Step Act programming while serving a federal sentence. [30] This is tremendous loss of programming credit for Mr. Mercurio. Second, the BOP does not currently offer any targeted deradicalization or counter-extremism programming that undersigned counsel is aware of. [31]

---

[28] *See* Exhibit B – Certificates of Completion
[29] *See* PSR at ¶86
[30] See 18 U.S.C. § 3632(d)(4)(D)(xlvii) (excluding from First Step Act Time Credits any prisoner serving a sentence for a conviction of "[a]ny section of chapter 113B, relating to terrorism.").
[31] *See* Terror Inmates: Countering Violent Extremism in Prison and Beyond: Hearing before the

Therefore, aside from his own disengagement with radical Islam over the past 2.5+ years while in custody – there will be little in the way of any meaningful programming to engage in further deradicalization and downward variance is supported on this basis pursuant to 18 U.S.C. § 3553(a)(2)(D).

Another point that was recognized by the Hon. Jack B. Weinstein, Senior U.S. District Court Judge for the Eastern District of New York in a 43-page opinion regarding an ISIS material support prosecution where he imposed a time-served sentence of almost two-years was the following:

> A weighty consideration is whether defendant's rehabilitation requires further incarceration. A lengthy prison sentence increases the risk that defendant will become embittered and regresses into radical beliefs. The prison system can be a breeding ground for radicalization. Islamic extremists often use "prisons to recruit new followers, reinforce the commitment of existing extremists and to network and exchange ideas with like-minded individuals." James Brandon, *The Danger of Prison Radicalization in the West*, 12 Combating Terrorism Ctr. Sentinel 1, 1 (Dec. 2009); see also Hughes Report at 8. We see this danger regularly not only with Islamic extremists, but with white supremacists, gang members, and others. *See, e.g.*, SpearIt, *Spectacular or Specious? A Critical Review of the Spectacular Few: Prisoner Radicalization and the Evolving Terrorist Threat*, 39 T. Marshall L. Rev. 225, 230 (2014).
>
> The United States has yet to develop a unified strategy to address the problem of prison radicalization; there are few deradicalization programs or initiatives in place that are targeted to rehabilitate extremists and help them reenter society as lawful individuals. See, e.g., Hr'g Tr. 27:21–30:3, June 27, 2018; Jessica Donati, *NYPD Analyst and Islamist He Tracked Are*

---

Subcomm. on Counterterrorism and Intelligence of the H. Comm. on Homeland Security, 114th Cong. (2015); *see also* Rethinking "Prison Radicalisation" - Lessons from the U.S. Federal Correctional System (11/6/18).

> *a Team Now*, The Wall Street J., Apr. 27, 2018 ("The U.S. lags behind its European counterparts in [counter-terrorism strategies], as it still lacks a targeted program to rehabilitate extremists and has no formal reintegration program, as dozens of convicts are set to be released in the next few years."). Other countries have addressed this problem by adopting policies that separate radicalized inmates from the general population. *See, e.g., Adam Nossiter, France Toughens Stance in Combating Radicals in Prisons and School*, NY Times, Feb. 23, 2018 ("[P]erhaps the greatest menace is in the country's prisons, and it is there that the government of President Emmanuel Macron [of France] is concentrating its fire with the changes announced on Friday aimed at isolating hundreds of radicalized inmates.").
>
> Further incarceration will inhibit defendant's reentry into lawful life and could encourage defendant to re-engage with violent extremism. Rehabilitation will more likely be achieved through a long term of supervised release, where he will be closely monitored by the Probation Department… [.] [32]

Finally, as to his potential for rehabilitation, Dr. O'Donnell noted that Mr. Mercurio was addressing his depression and verbally committed to de-radicalization, although he does continue to practice Islam. The PSR also noted that Mr. Mercurio was prescribed antidepressants at FDC-SeaTac while in custody, specifically Remeron (Mirtazapine) – 30 mg daily. [33]

## V. Conclusion

Mr. Mercurio's conduct was serious and deserves a serious sentence. He is also not beyond rehabilitation nor redemption. As such, Mr. Mercurio respectfully asks the Court to impose a sentence of 108 months with 15 years of supervised release to follow.

---

[32] U.S. v. John Doe, 1:14-cr-0612-JBW (E.D. NY 2018) at *40-41.

[33] *See* PSR at ¶78.

Dated: November 3, 2026

Federal Defenders of E. Washington & Idaho
Attorneys for Alexander Mercurio

s/Carter Powers Beggs
Carter Powers Beggs, WSBA No. 60065
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
carter_powersbeggs@fd.org

s/J. Stephen Roberts, Jr.
J. Stephen Roberts Jr., WSBA No. 45825
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
**Steve_Roberts@fd.org**

**Service Certificate**

I certify that on November 3, 2026. I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Heather Patricco and Dave Robins.

s/Carter Powers Beggs
Carter Powers Beggs, WSBA No. 60065
601 West Riverside Ave., Suite 900
Spokane, Washington 99201
t: (509) 624-7606
carter_powersbeggs@fd.org